## 11804

## CENTRAL NAT. BANK OF SPARTANBURG v. KEHOE ET AL.

### (128 S. E., 861)

1. BILLS AND NOTES—EVIDENCE HELD NOT TO REQUIRE FINDING CHECK HAD BEEN NEGOTIATED BACK TO MAKER AND REISSUED SO AS TO RELIEVE INDORSER.—Evidence that check, in payment for land, was given by purchaser to attorney, who examined title, by him endorsed to real estate agent, who had acted for purchaser, and by him in turn indorsed to another real estate agent, who had acted for seller, *held* not to require finding that check, after maturity had been negotiated back to maker and reissued, so as to relieve attorney as first indorser from liability.

2. CONTRACTS—PROVISIONS OF LAW IN FAVOR OF ANY PERSON MAY BE WAIVED BY CONTRACT NOT AGAINST PUBLIC POLICY.—Provisions of law in favor of any person may be waived by contract not against public policy.

3. APPEAL AND ERROR—FINDINGS IN ACTION AT LAW CANNOT BE REVIEWED UNLESS WHOLLY UNSUPPORTED BY EVIDENCE.—Findings in action at law cannot be reviewed unless wholly unsupported by evidence.

4. BILLS AND NOTES—ESSENTIALS TO LIABILITY OF INDORSER ON CHECK STATED.—Under Civ. Code 1922, §§ 3703, 3717, 3740, for indorser to be liable on check, there must have been indorsement without qualification, a dishonor, timely notice thereof, and a holder in due course.

b. BILLS AND NOTES—CHECK HELD TAKEN FOR COLLECTION ONLY, AND BANK NOT HOLDER IN DUE COURSE.—Bank accepting check and issuing certificate of deposit reciting that checks were accepted subject to final payment *held* to have accepted check only for collection, and not a holder in due course, so as to entitle it on nonpayment to recover from indorser.

Before SHIPP, J., Spartanburg, 1925. Reversed.

Action by the Central National Bank of Spartanburg against John W. Kehoe and others. Judgment for plaintiff against defendant, F. Gentry Harris, and he appeals.

*Messrs. Lyles, Daniel & Drummond,* for appellant, cite: *Endorsement of check to prior party:* Code 1922, Vol. 3, Secs. 3701, 3770; Crawford's Ann. to N. J. L., 195; 8 C. J., 342. *Check for collection credited conditionally:* 92 S. C., 440; 24 S. E., 265; 79 S. E., 498; 54 Am. Rep., 50; 54 S. E., 862; 19 S. W., 334; 20 Atl., 508; 51 A. S. R., 74; 8 C. J., 482. *Construction of Negotiable Instrument Law:* 3 R. C. L., 854 *et seq.*

*Messrs. Bomar, Osborne & Brown,* for respondent, cite: *Holder for value:* Code 1922, Vol. 3, Secs. 3676, 3677 and 3703; 122 S. E., 24. *Sanctity of commercial paper:* 117 S. C., 140; 115 S. C., 381; 105 S. C., 103; 103 S. C., 342; 103 S. C., 174; 100 S. C., 64; 91 S. C., 461.

July 15, 1925.

The opinion of the Court was delivered by MR. ACTING ASSOCIATE JUSTICE R. O. PURDY.

The issues involved in this case were referred to the Master for Spartanburg County, and the nature of the case will be made to fully appear from the Master's report, which report is as follows:

"This is an action brought on a check by the plaintiff for $1,001 against the defendant John W. Kehoe, maker, and the defendants F. Gentry Harris, N. O. McDowell, and J. T. Willard as indorsers. All of the parties have been duly served, as is shown on the reverse side of the summons and complaint. An order of reference was duly passed, in pur-

suance of which I have held a reference and have taken the testimony, which is herewith filed as a part of the record.

"A brief statement of the facts from which this action grew will be in order: It appears that one John W. Kehoe, who represented himself as a promoter and general financier, came to Mr. N. O. McDowell and stated to him that he had plans for the establishment of some type of a manufacturing enterprise for Spartanburg, and that he was seeking a location for his plant. Mr. McDowell, who was in the real estate business, immediately sought a piece of property that he thought would be satisfactory to Kehoe. He went to J. T. Willard, who was also in the real estate business, and asked if he had for sale such property, stating that there was a man from the North who was interested in buying it for development purposes. The property was decided upon, and an option for it was taken. Later it proved to belong to Mr. Thad C. Dean, as executor. After several days Kehoe appears to have agreed to take the property according to the terms of the contract between McDowell and Dean. The defendant, F. Gentry Harris, appears to have been employed by Kehoe to look up the title and to represent him in the deal, as attorney. On the 16th day of January, 1922, in the office of Mr. Harris, the deal was consummated, and a check for $1,000, payable to F. Gentry Harris, Attorney, on the Bank of Union, Union, S. C., and signed by John W. Kehoe, was turned over to Mr. N. O. McDowell as agent for John W. Kehoe. The check was dated January 10, 1922, and was drawn on the Bank of Union, Union, S. C.

"Mr. Harris indorsed the check, signing his name as F. Gentry Harris, attorney, to Mr. McDowell, agent, and Mr. McDowell in turn indorsed the check to J. T. Willard, agent for Thad C. Dean, executor, and signed his name as agent for John W. Kehoe. On January 17th, Mr. Willard presented the check to the plaintiff, the Central National Bank, and had the proceeds credited to his account, having indorsed it in terms responsive to the indorsement to him. As was stated above, the check was drawn on the Bank of

Union, and was sent by the plaintiff to its correspondent in Union for collection. Immediately the check was turned down by the Bank of Union and sent back to the plaintiff, with protest notices attached to the back of the check. These notices were duly offered in evidence. When the check reached the Central National Bank, Mr. Pearson, one of the bookkeepers, on Wednesday, January 18th, charged it back to the account of Mr. F. Gentry Harris, and mailed the check, the pink slip, and the protest notices to Mr. Harris. This was immediately after it was received from the Bank of Union. At that time Mr. Harris was in the Legislature, and, according to his testimony, did not get his mail until Friday afternoon of the same week, amongst which was the check and protest notices, etc., from the Central National Bank. Early Saturday morning he took the matter up with Mr. Pearson, stating that there had been a mistake in charging the check to him, since he did not receive the proceeds of it, and asked that it be sent back to Union again, and in case of its return to have it charged to the account of J. T. Willard. The check was sent back to Union and was promptly returned, having been dishonored the second time. In the meantime, Mr. Pearson was sick, and Mr. Cobb, who was substituting for him at that time, again notified Mr. Harris. Whereupon Mr. Harris again brought' the matter to the attention of Mr. Cobb, who charged it back to the credit of Mr. Harris, giving him a deposit slip for it.

"The matter then rested for a considerable length of time, as quite an effort was made to negotiate a settlement between the parties and satisfy the bank. At length this was despaired of, and this suit was brought by the bank against the various defendants.

"The defendant Kehoe, who has long since left the country and no one knows as to his whereabouts, proved to be a fraudulent and absolutely irresponsible party, so the bank, knowing of his reputation, is looking now to the various indorsers to make good the check. It is also admitted by

plaintiff's attorney that neither McDowell nor Willard can be held liable under the Negotiable Instrument Law, because of the fact that they have never been notified by the bank that the check was dishonored and protested by the Bank of Union. In volume 3 of the Code, § 3740, it is provided that 'notice of dishonor must be given to the drawer and to each indorser, and any drawer or indorser to whom such notice is not given is discharged.' Therefore, it having been admitted that neither McDowell nor Willard ever had any notice, the result naturally and logically follows that they are automatically discharged, and the entire contest therefore is between the plaintiff and the defendant Harris.

"I have given this matter considerable thought, and I cannot see any other basis for a determination of it than that of our uniform Negotiable Instrument Law. Every act of both the plaintiff and the defendant Harris seems to square itself with the provisions of this law, and it is so clear in prescribing a remedy when the various conditions are met that there is nothing left for the Court to do but find a verdict for the plaintiff.

"In section 3717, of volume 3 of the Code, it is provided that: 'Every indorser who indorses without qualification, warrants to all subsequent holders in due course: First, that the instrument is genuine and in all respects what it purports to be. Second, that he has good title to it. Third, that all prior parties had capacity to contract. Fourth, that the instrument is at the time of his indorsement valid and subsisting. Fifth, and, in addition, he engages that on due presentment, it shall be accepted or paid, or both, as the case may be, according to its tenor; and that if it be dishonored, and the necessary proceedings on dishonor be duly taken, he will pay the amount thereof to the holder, or to any subsequent indorser who may be compelled to pay it.' Practically the only question is whether or not Mr. Harris has been duly and properly notified of the dishonor of the check, and there

seems to be no doubt or question about that, according to his own testimony.

"I am very much impressed with the defense of defendant's attorney in regard to the fact that it was the custom of the bank to charge back a check when it was dishonored to the party who had received the benefits of it. I am satisfied that that was the custom of the bank, and Mr. Harris may have been misled by it, but at the same time, as between the codified law, and a custom, the law must prevail. Mr. Harris evidently knew what his indorsement meant when it was placed on the back of the check and turned in the channels of trade. If the bank preferred to stand on its custom in dealing with its patrons, it could have done it, and therefore would have charged the check to Mr. Willard and held him responsible for it. But in the very face of its custom it invokes the aid of the law, and complies with every provision of it for its protection.

"Counsel for the defendant argues that the bank was not a holder in due course, that there was a lack of consideration. I cannot agree with this statement, for it seems to me that the bank fulfills every requirement of a holder in due course. It certainly parted with $1,000 for the check. That is an undisputed fact, and it was further testified that it was on the strength of the indorsement that prompted it to buy the check.

Mr. Harris complains that he was not treated right in the matter, that he was only an attorney, paid a small fee for looking up the title, and acted merely as a stakeholder, whereas Mr. Willard received something like half of the proceeds of the check, and for that reason should be held responsible to the bank for it. I am frank to say that I sympathize with Mr. Harris in this position, but the statute law and our Supreme Court in numerous cases take a different position. It has been held time and time again that an indorser must stand by his indorsement even though it is made for a mere accommodation, and it is not for me to try and

undo by a decision in this matter what both the Legislature and our Courts have already done. Therefore, after a very careful review of all the testimony and of the law as bearing on the matter, I am convinced that the plaintiff should have judgment against the defendant Mr. Harris for the $1,001 in addition to paying the costs of this action."

To this report, the appellant Harris filed a number of exceptions, and, the case coming on to be heard by his Honor, Judge Shipp, the exceptions were overruled, and the report of the Master was confirmed, Judge Shipp holding that, while the exceptions raised various points, the only main question involved was whether, under the evidence and the law, the appellant Harris is liable as indorser for the amount sued for, and judgment was given against the appellant for $1,000, with interest from January 10, 1922, and costs.

From this judgment, Harris has appealed upon a number of exceptions.

The first exception imputes error on the part of the Circuit Court in not holding that the check had, after maturity, come into the hands of the principal debtor, Kehoe. Harris takes the position that this check was negotiated back to Kehoe, and that it became a reissued check, and that the defendant Harris cannot be held liable.

The facts are that this check was left with Harris, as attorney for the defendant Kehoe, and passed through the hands of McDowell, who was the agent of Kehoe, and was made payable to the order of J. T. Willard, agent for the defendant Dean, as executor, and was delivered to A. C. Willard, the partner of J. T. Willard. It will be seen, there·fore, that the check did not come back into the possession of Kehoe in his own right, and that it was issued only one time, and thus, did not afterwards come into possession of Kehoe, either personally or through his agents, and this exception is overruled.

The other exceptions impute error to the Circuit Court in substance: In not holding that the deposit of the check

with the bank was a conditional deposit, subject to payment, and, if not collected, it was to be charged back to the account of J. T. Willard; in not holding that the bank did not buy the check from Willard; in not holding that the relation of principal and agent existed between the bank and Willard; in not holding that, as the bank did not incur any additional liability by reason of the deposit, it did not thereby become the owner of the check; in not holding that the bank, after discovering that it had not charged back the check to the account of Willard, could not hold Harris liable for consequences growing out of failure to charge back the item; in not holding that the bank, by its negligence, had created an independent liability on its part to Willard, and could not pass on such liability to Harris by changing a conditional credit into an absolute credit; in not holding that the bank, by a failure to notify Willard of the dishonor of the check, released his liability thereon, and had the bank notified Willard, he would have had no recourse against Harris, because Willard had full knowledge that Harris' relation was that of a mere stakeholder; and erred in not sustaining the third exception to the Master's report, viz.:

2       The Master having held that he was satisfied that it was the custom of the bank to charge back a dishonored check to the party who received the benefits of it, and that Harris might have been misled by it, but that nevertheless the codified law must prevail over custom, should have held that the provisions of law in favor of any party might be waived by a contract where it is not against public policy, and that the facts show waiver in this case by the bank.

His Honor, Judge Shipp, summed up these exceptions in his judgment, when he said that these exceptions involved only one main question—as to whether under the evidence and the law, Harris was liable as indorser for the amount sued for.

This being an action at law, it cannot be reviewed unless the findings of the Circuit Court are wholly unsupported by the evidence. When the holder of a check indorses it and turns it in the channel of trade, he is subject to the rules as laid down in the statute, and as appeared in the report of the Master. There are four preliminary questions as to liability: (1) An indorsement without qualification. (2) The dishonor of the check. (3) Timely notice of its dishonor. (4) A holder of the instrument in due course; that is to say that it was taken in good faith and for value, and without any notice of an infirmity or defect of title and otherwise regular, as is provided in section 3703 of the Civil Code.

There is not any question about the fact that the check was lodged with the bank, that it was promptly sent off for collection, and, upon its return dishonored, notice was given to Harris. Therefore, if the bank is the holder of the check in due course, the judgment of the Circuit Court would be affirmed, and if there is any dispute about that fact it would likewise be affirmed, for the reason that this Court cannot decide issues of fact in a case of this kind.

This brings us to the consideration of the turning point in the case. The relationship to the check as between the depositor, Willard, and the bank, is to be determined by the intention of the parties as evidenced by their acts in relation to the check. Taking any one fact standing by itself, it might be deemed to be only evidence of what was intended, and not conclusive; taking all of the acts done and the circumstances, the conclusion is inevitable that the check was placed with the bank for collection, subject to final payment, and that the bank did not become the owner of it. On the part of the bank, it gave a certificate of deposit, of which the following is a copy:

"Deposited in the Central National Bank, Spartanburg, S. C., by J. T. Willard.

"No.————                                    Jan. 16, 1922.

Checks and drafts credited subject to final payment. Please list each check separately.

| | | |
|---|---|---|
| Currency ......................... | ........ | ....... |
| Silver ........................... | ........ | ....... |
| Gold ............................ | ........ | ....... |
| Checks as follows: | | |
| List each check separately. | ....... | |
| .............................. | 1,000 | 00 |
| ...................... | | |

"Floyd L. Cobb."

This specifically states that the deposit was taken subject to final payment.

The undisputed testimony of all the bank officials is that such items were received subject to payment, and, if not paid, they should be charged back to the account of the depositor.

On the part of Willard, the depositor, and Dean, his principal, we find from the testimony of Willard, that the following took place between them:

"I explained the matter to Mr. Dean, and Mr. Dean said, 'Who is Kehoe?' and I said, 'I don't know the man'; and he said, 'Go and deposit that check, and see whether it is any account or not'; and in a week or ten days I said, 'I reckon the check has gone through all right, I haven't heard anything from it'; and then Mr. Dean went over there, settled with Mr. Aycock, and put Mr. McDowell in possession of the property."

Mr. Aycock was a tenant on the Dean property.

Dean, the principal, testified:

"Immediately after Mr. Willard received the check for $1,000 he came to me and I declined to go ahead and revoke

my contract with Mr. Aycock until he knew the check was paid, and he held it off for. 10 or 12 days."

These acts show conclusively that Dean, the principal, and Willard, his agent, intended to treat the check as an item for collection, and the bank so received it, and, in so receiving it, it became only the agent for the collection of the check and not the owner of it. "It is settled that the mere discounting and crediting of the amount on the depositor's account, without making payment or incurring any increased obligations or liabilities is not sufficient to make the bank a *bona fide* holder for value; and a conditional credit is, of course, insufficient." 8 C. J., 482.

All the parties between Harris and the bank knew that he was a mere stakeholder of the check and had no interest in it, and knew the capacity in which he was acting. It appears from the testimony that Dean and Willard, not knowing Kehoe, were cautious in dealing with his check; one of the officers of the bank stated that he knew of the unsavory reputation of Kehoe, and the Master, in his report, says, in speaking of Kehoe, "So the bank, knowing his reputation, is looking to various indorsers to make good the check."

The bank's attorneys, in their argument, take the position that by the deposit of this check Willard actually got $1,000, and that he, in fact, deposited this in the bank. This is what the bank's attorneys deem to be the legal effect of the deposit, but the Court does not so conclude, as a matter of fact, for we think that the only inference that can be drawn from the testimony is that the check was lodged for collection.

The bank cannot complain, for the reason that its position was not changed; it did not part with anything of value, the depositor was a man of repute and of means, and was frequently allowed to overdraw, and there does not appear to have been any anxiety on the part of the bank to retain the check to cover an overdraft, and there is not any such suggestion in the finding of the Master or the judgment of the Circuit Court.

The bank did not become a holder in due course under the statute when the check was deposited. It did not charge back the item to the account of the depositor, Willard, and, so far as the evidence discloses, it was never charged to him, but it was charged to profit and loss.

Having received the check for collection and as the agent of the depositor, the bank cannot now, with full notice of the infirmity of the instrument, after its dishonor, go back and make itself a purchaser of the check, and thereby seek to hold Harris liable.

It was urged before the Court that Harris had never denied his liability, but had admitted it to counsel for the bank. The Master has not, in making up his judgment, referred to this as having any persuasive force in affecting his judgment, nor has he referred to the testimony to the effect that Mr. Law, president of the bank, asked Harris in a conversation, "Who got the money?" and upon being told that Willard got it, added: "Then Mr. Willard is the man that we are looking to for the money."

The Master has based his judgment upon the provisions of the Negotiable Instruments Act, holding that "every act of both the plaintiff and the defendant Harris seems to square itself with the provisions of this law." Having found from the uncontroverted testimony in the case that the bank is not the holder of the check in due course, it is not necessary to discuss the effect of the failure in this case to observe the custom of the bank, which was to charge back an uncollected item to the depositor, except to say that Harris knew of such custom, and, as the Master has found, may have been misled by it.

The exceptions other than the first exception are sustained.

It appears from the testimony that when the check was dishonored it was charged to the account of Harris. Harris objected to this, and suggested that the check should have been charged to Willard. He returned it to the bank to be sent back, hoping that it would be paid, and stated that, if not paid, it should be charged to the account of Willard.

It was returned the second time, and was again charged to the account of Harris, and, after he had protested, he was given credit for the amount, and the bank seeking to charge the item to Willard's account, met from Willard a protest, whereupon it went into the "profit and loss" account, and was never charged to Willard's account.

So it will be noted that from the circumstances attending the transaction, the bank had notice of facts and circumstances which, if followed up, would have fully disclosed the nature of the entire transaction, if it did not get actual notice of such transaction in its conversation with Harris and the other parties interested.

It did not pay out anything when the check was deposited and, having promptly handled the check in the first instance and, by its return, received notice that it was handling a questionable check, and not being then the owner of it, if it purchased it after that time, it would have been at its own risk. But it is not necessary to base the judgment on this ground. Reversed.

MR. CHIEF JUSTICE GARY and MESSRS. JUSTICES WATTS, COTHRAN and MARION concur.

## ORDER

The Court hardly thinks it necessary to disclaim a purpose to reflect upon the integrity of the bank in this case, but at the suggestion of attorneys for the bank enters a disclaimer to that effect. Let this order be printed with the report of the case.

The order staying *remittitur* is revoked.

EUGENE B. GARY,
        Chief Justice.
R. C. WATTS,
T. P. COTHRAN,
J. H. MARION,
        Associate Justices.
R. O. PURDY,
Acting Associate Justice.